


# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) CASE NO. SV 03-15884-KT |
| SHAHRIAR DARGAHI and<br>NAZILA ADELI-NADJAFI,<br><br>Debtors. | ) CHAPTER 11<br><br>) INTERIM MEMORANDUM ON<br>) CONFIRMATION OF DEBTORS'<br>) CHAPTER 11 PLAN<br><br>) DATE:    January 23, 2008<br>) TIME:    10:00 a.m.<br>) PLACE:   Courtroom 301<br>)         21041 Burbank Blvd.<br>)         Woodland Hills, CA |

Shahriar Dargahi and Nazila Adeli-Nadjafi are the debtors in the above-captioned chapter 11 case. The Debtor's Third Amended Plan of Reorganization (the "Plan") came on for confirmation on December 3 and December 5, 2007. Pursuant to the ballot summary filed by the Debtors, two classes of impaired claims have voted in favor of the plan: Class 3 consisting of holders of general unsecured claims and Class 4 consisting of holders of claims against Mrs. Adeli-Nadjafi's professional corporation guaranteed by either or both debtors.

California State Board of Equalization ("SBE") and the Internal Revenue Service ("IRS"), holders of priority tax claims, filed objections to the confirmation of the Plan. The court is informed that SBE's objection has been resolved. The IRS withdrew its objection to confirmation. Neither the IRS or SBE appeared at the confirmation hearing.

Secured creditors Kest Investment Company and Anaheim Capital, LLC (collectively, "Kest"), the members of Class 1a, voted against the Plan and filed an objection to confirmation. Kest, the only remaining objecting creditor, raised the following issues:

1. The Plan does not provide an appropriate "cramdown" interest rate on Kest's claim.
2. The Plan is not feasible because:
   a. The Debtors' projections are not credible and are not supported by the evidence, both present and historical;
   b. The Debtors' projections do not support the payments required under the Plan even if the Debtors are correct in their estimate of Kest's secured claim;
   c. The Debtors underestimate the amount of Kest's secured claim by not less than $370,000 and by as much as $471,460;
   d. The Debtors do not have sufficient income to make the required payments on Kest's secured claim;
   e. The Debtors do not have sufficient income to make the required payments on Kest's secured claim if an appropriate market rate of interest is applied;
   f. It is not feasible to refinance or payoff the Kest secured claim by August 2009; and
   g. The Debtors do not have the ability to pay off the SBE claim within six years of assessment because the SBE claim is currently in excess of $125,000 and more than four and a half years have passed since the case was filed, thereby requiring approximately $7000 a month going forward.

Kest is the holder of a promissory note executed by the Debtors in 1997 in the initial face amount of $400,000 (the "Note"). The Note is secured by a first priority trust

2

deed on certain real property in Long Beach, California, upon which the Debtors operate a gasoline station (the "Gas Station"). The Note was amended in 1999. Under the amended note, the balance was fully due and payable in August 2007. As of the end of November 2007, Kest contends that it is owed not less than $717,598 consisting of principal and interest through November 2007 in the amount of $536,998.62 and $180,599.91 in fees and expenses.

The amount due under the Kest Note is the subject of a pending adversary proceeding. The Debtors claim, among other things, that they are entitled to a reduction in the principal of $100,000 along with the fees and expenses claimed in connection therewith.

In the Plan, the Debtors propose to treat Kest's claim as having a value of $347,500, consisting of $300,000 in principal and $23,750 in pre-petition arrearages and $23,750 in post petition arrearages. The Debtors propose to pay Kest either (1) $3,417.87 or (2) *"[t]he amount of the monthly payment that would be due on 30 year [sic], amortized loan on the court determined balance; which ever is more..."* These payments are proposed to be made *"until August, 2009, by which time Debtors will refinance or sell property and pay Claimant in full. Claimant will retain its lien. The amount of payment and balance to be paid is subject to modification if legal proceedings filed against Claimant determine Debtors entitled to off-set or other relief."*

At the hearing on confirmation, the parties focused on two primary issues:

1. The rate of interest required to effect cramdown of Kest's secured claim; and
2. Whether the Plan is feasible if the Debtors prevail on the dispute as to the amount of Kest's secured claim.

<u>The Required Rate of Interest on Kest's Secured Claim</u>

Section 1129(b)(1) of the bankruptcy code allows confirmation over the objection of creditors if *"the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under the plan, and has not accepted the plan."* A plan is "fair and equitable" with respect to secured creditors if the secured creditor receives on account of its claim *"deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property."* (§ 1129(b)(2)(A)(i)). Kest correctly interprets this standard as requiring a dissenting impaired creditor to receive a rate of interest which will result in payment of the present value of the creditor's claim.

Under Ninth Circuit law, when the parties disagree about the rate of interest, the appropriate rate is the rate the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and the security for the loan. <u>United States v. Camino Real Landscape Maint. Contr., Inc.</u> (<u>In re Camino Real Landscape Maint. Contr., Inc.</u>), 818 F2d. 1503, 1504-1506 (9th Cir. 1987).

3

The evidence before the court on this issue came from three sources. Kest offered testimony from Adi Harari, the president of Delta Home Loans, Inc. Mr. Harari was qualified as an expert in commercial lending in general and more specifically based upon his evaluation of more than 25 loans placed on gas stations. Mr. Harari testified that a traditional commercial lender on a gas station would charge 8.5% to 9% interest to a borrower with a 70% loan to value ratio and debt service ratios of at least 1.5% to 1.6%. In addition, such a lender would look at other factors such as environmental insurance, payment history, cash reserves, cash flow, and tax liens. Mr. Harari concluded that no traditional lender would make a loan to the Debtors in this case. Mr. Harari further concluded that a hard money lender who would look solely to the value of the collateral and not to the financial capacity of the borrower, would loan only 70% of the value of the collateral at a rate of between 13% to14%. Mr. Harari opined that only an equity/joint venture lender would go above the 70% loan to value ratio and would require a 25% annualized return under the facts of this case.

In contrast, the Debtors argued that Mr. Harari's testimony contradicted the formula approach approved by the Ninth Circuit in In re Fowler, 903 F2d 694 (9th Cir. 1990), as explained in the case of In re Villa Diablo Associates, 156 B.R. 650 (Bankr. N.D. Cal. 1993). The formula approach proposed by the Debtors would establish a base rate for the commercial real estate loan market by looking at the rate of treasury obligations, the prime rate, the London Interbank Offered rate, the Eleventh District Cost of Funds index, or some other established index and adjust that base rate by adding or subtracting basis points taking into account various factors like the nature of the loan, the value and quality of the collateral, and the risk of default.

In support of this analysis, the Debtors offered a printout of an internet posting by the Los Angeles Times of "Average mortgage rates and indexes." This printout includes rates current as of November 21, 2007 for 6-month LIBOR, 1-year treasury bills, 6-month treasury bills, 6-month CDs, the prime rate, and the 11th District cost of funds. This print-out also includes rates for real estate loans but it is not clear whether they apply to residential or commercial loans, or both. The Debtors assert that their offer of a 9% rate is not unreasonable because the base rate for commercial real estate loans with a strong borrower falls somewhere between 5.75% and 7%. The Debtors ask the court to consider that the Gas Station is a stable operation that has been in business for many years and sells a product which is a consumer necessity.

The other source of information on loan rates is the history of Kest's loan to the Debtors. The original loan was made in 1997. In 1999, the note was amended to raise the interest rate to 12% and included a provision for accrual of interest at 9% after October 2001. The interest on the note is one of the things at issue in the adversary proceeding brought by the Debtors against Kest and the court makes no findings with regard to that dispute in this memorandum. Nonetheless, the court notes the range of rates negotiated by these same parties at an earlier time, including negotiations involving defaults. Since that time, the risk posed by the Debtors as borrowers has increased and prevailing interest rates in the United States economy have decreased.

Although the court is not entirely satisfied with the information offered through Mr. Harari's testimony or that proposed for consideration by the Debtors, I have reached the following conclusions. The base rate of interest for the first $487,500 (65% of liquidation value at $750,000), should be 9%, to which an additional 2% should be added on account of risk factors such as loan history, tax liens, and lack of cash reserves, for a rate of 11%. The amount, if any, by which the Kest obligation exceeds $487,500 requires a rate of 14% up to $675,000 . If the amount of Kest's allowed claim exceeds $675,000, as asserted by Kest, then the court will further consider the appropriate interest rate to be applied to the remaining tranche of debt in conjunction with the Debtors' ability to service the debt.

### Feasibility

#### Income Available to Fund the Plan

#### The Gas Station

The information about the Gas Station for January through August 2007 shows net income of approximately $35,300, without payment of ongoing debt service to Kest or James Gotturchat, the holder of the second trust deed on the Gas Station. (Debtors' Ex. 14 and Kest's Ex. F) Minimum proposed payments to Kest and Gotturchat under the Plan total $5,113.87 per month. Therefore, if the Debtors had been making the minimum payments under the Plan during the first eight months of 2007, the Debtor would be short approximately $5,600. However, the expenses paid by the Gas Station in this time period include approximately $29,900 in expense category of wages that went to Mr. Dargahi. (Debtors' Ex. 13) As the owner, Mr. Dargahi has theoretical control of his own draws and can choose to pay the debts of the Gas Station before he pays himself. If Mr. Dargahi had taken no draws for himself, the Gas Station would have had approximately $8,150 per month to contribute to payments due under the plan and the Debtors' necessary living expenses.

The Debtors offered financial information about the Gas Station operations for 2004, 2005, and 2006. In 2004, with adjustments to delete certain expenses no longer applicable and professional services related to this bankruptcy case, the Gas Station had a net profit before taxes of approximately $91,400 available for debt service, an average of approximately $7,600 a month. (Debtors' Ex. 10) In 2005, with similar adjustments, the Gas Station had a net profit before taxes of approximately $104,300 available for debt service, an average of approximately $8,690 a month. (Debtors' Ex. 9)

Although the information for 2006 is particularly difficult to assess, it appears that the Gas Station lost approximately $5,300 on a cash basis. (Kest's Ex. A). If the bank charges and professional services are deleted consistent with the analysis for 2004 and 2005, then the Gas Station would be in a net profit status (approximately $29,000 minus $5,300) but not in an amount sufficient to cover minimum debt service under the Plan allocated to Kest and Gotturchat. Debtors' Ex. 8 shows cash taken by Mr. Dargahi, classified as wages, in the amount of $19,365 in 2006. If Mr. Dargahi had set

5

aside the minimum payments proposed to Kest and Gotturchat under the Plan, there would still be a deficit of approximately $18,300 for 2006. Mr. Dargahi testified that 2006 was unusual because the Gas Station was charged for a shipment of gasoline which was not in fact delivered and he was unable to get an adjustment for it. There is no evidence that the financial picture for 2006 was not skewed by this event but there is no explanation from the Debtors as to the scope of the effect on the Gas Station's bottom line.

### Mr. Dargahi's Employment Income

Mr. Dargahi is a construction inspector employed by the Los Angeles Unified School District ("LAUSD"). Mr. Dargahi's gross earnings from the LAUSD were $90,868.86 in 2005 and $92,835.98 in 2006. (Debtors' Ex. 15) Mr. Dargahi testified that his gross wages from LAUSD will be at least $100,000 in 2008 and expects annual cost of living increases in the years thereafter. A reasonable calculation of Mr. Dargahi's take home pay is approximately $6,800 a month.

### Dr. Adeli-Nadjafi's Income

Mr. Dargahi's wife, Dr. Adeli-Nadjafi, is a dentist with a professional practice set up as a corporation of which Dr. Adeli-Nadjafi is the sole shareholder. As with the Gas Station, the financial records for Dr. Adeli-Nadjafi's dental practice are done in an ad hoc manner. No records at all were provided for 2007.

Dr. Adeli-Nadjafi submitted unaudited income and expense statements based on cash transactions for 2004, 2005, and 2006 (Exs. 1 – 3) and lists of checks itemized by category for 2004, 2005, and 2006 (Exs. 4 – 6). In addition, Dr. Adeli-Nadjafi submitted summaries of income and net profit before taxes prepared from actual bank statements by her accountant for 2004 and 2005 (Exs. 11 and 12). The accountant's summary information in Ex. 11 for 2005 and Ex. 12 for 2004 is not consistent with the raw information for those same years set out in Ex. 2 and Ex. 3. Dr. Adeli-Nadjafi was unable to offer any explanation for the differences. Having found the accountant to be a credible witness, the court discounts Exs. 2 and 3 for the most part in favor of the accountant's summaries for these years. Nonetheless, Exs. 2 and 3 provide some useful detail information.

The accountant's summaries show a profit before taxes of $18,019 in 2004 and a deficit of ($9,194) in 2005. These bottom line figures are then adjusted to separate "mandatory expenses" from "discretionary expenses." As adjusted, discretionary income from the dental practice, before taxes, was $46,214 in 2004 and $46,875 in 2005.

The raw data for 2006 in Ex. 4 consists of lists of credits and debts said to have been compiled from the bank statements and set out in categories. There is no accountant's summary for 2006. Even so, the raw data is useful. Ex. 4 demonstrates that Dr. Adeli-Nadjafi routinely used the bank account for the dental practice to pay her personal expenses. Some of her personal expenses appear in the category of "wages."

Additional personal expenses come under such categories as auto fuel, auto loan, clothing, household, medical, and vacation. Categorized expenses for 2004 (Ex. 3) and 2005 (Ex. 4) are consistent with this data and Dr. Adeli-Nadjafi confirmed that, in essence, she uses the corporate account as a personal account.

In summary, both the Debtors' accountant and Dr. Adeli-Nadjafi testified that there is income from the dental practice that has been spent on the Debtors' personal expenses which is available, in the future, to make payments under the Plan. The evidence submitted in support of this contention is persuasive notwithstanding the inconsistencies and unprofessional preparation and presentation thereof.

Approximate available monthly income from the dental practice, before taxes, was $3,850 in 2004 and $3,900 in 2005. In 2006, the data supports an estimate of $3,900 per month. Based on the foregoing, the court is persuaded that Debtors' estimate, as set forth in the Disclosure Statement, of $3,200 a month from the dental practice for post-confirmation payments and expenses is feasible.

### Summary of Income Available to Fund the Plan

Based on the foregoing analysis, it is reasonable to assume that the Debtors will have at least $18,000 a month to support post confirmation plan payments and personal expenses from the following sources: $8,000 from the Gas Station; $6,800 from Mr. Dargahi's employment; and $3,200 from Dr. Adeli-N's dental practice.

### Required Payments Under the Plan As Proposed

Proposed payments per month under the Plan not including Kest equal $5,302.16. The minimum monthly payments due Kest under the Debtors' Plan using $347,500 at 11% amortized over 30 years would be $3,310. Therefore, the Debtors must have no less than $ 8,612.16 a month to fund the Plan as presently proposed.

### Income Required to Fund Personal Expenses

The Debtors testified that their monthly expenses as shown on their Schedule J (Ex. 16) are still valid figures which, when adjusted downward for expenses now paid through Mr. Dargahi's employment with LAUSD and child care expenses no longer applicable, show that they need approximately $6,300 per month to fund their personal expenses.

### Feasibility of Plan at Debtors' Estimate of Kest's Claim

The Debtors need approximately $15,000 a month (rounded up from $14,915) to fund the proposed payments (as adjusted for the interest rate to Kest) and their personal expenses. Notwithstanding the problems presented by the Debtors' evidence of income and expenses, the financial data shows that they can reasonably expect to have approximately $18,000 a month (on the average) with which to fund these payments. Therefore, on a threshold basis, the court believes that the Debtors have

shown that they will have the ability to perform under the Plan as presently proposed.

Kest raises a further challenge to feasibility not directly related to the allowable amount of Kest's claim, i.e., whether the passage of time since the date of assessment of SBE's claim has made it impossible for the Debtors to pay this claim within six years of assessment as required under the Plan. The Debtors have not addressed this issue in their post trial brief. The Debtors must submit a response on this issue.

### The Debtors' Good Faith

Kest raises other issues related to the Debtors' good faith which are closely related to the feasibility of the Plan. This case was commenced on July 14, 2003, nearly five years ago. Since then, the Debtors have remained current on their personal obligations debt but have made no ongoing payments to the holder of the second trust deed, James Gottfurchat, on the Gas Station. The Debtors have made 29 payments of $5000 each to Kest during the course of this case and these were made only because they were required by court order.

Notwithstanding the moratorium on payments to Kest and James Gottfurchat, the Debtors have saved virtually nothing over these past four years. More than one scenario can explain these facts. The Debtors could be under-stating their necessary expenses. The Debtors could be over-estimating their net income. The Debtors could have used the excess income to pay extraordinary expenses like the costs of remodeling to the dental practice or shortfalls in 2006 caused by the missing gasoline shipment. The Debtors may have spent virtually all surplus income on vacations and other non-necessity luxuries.

The Debtors testified that they did not make payments to James Gottfurchat or additional payments to Kest because they were not ordered to do so. They also argue that their payments to Kest when required were made, thus demonstrating their ability in the future to fund at least $5000 per month on these two obligations.

There is insufficient information at this time for the court to make a finding of bad faith in the prosecution of this Chapter 11 case or the proposal of the Plan. The pending adversary proceeding in which the amount of Kest's claim will be set will provide information necessary to the determination of feasibility, including the likelihood of the ability to refinance or pay off Kest in August 2009 and shed light on the Debtors' good faith.

### CONCLUSION

Based on the foregoing, a final ruling on confirmation will not be made until the amount of Kest's claim has been determined in the pending adversary proceeding brought by the Debtors and the submission of a response by the Debtors on the issue

of whether the Debtors can fund the payments due to SBE.

Dated: **MAR 0 3 2008**

                              */s/ Kathleen Thompson*
                              Kathleen Thompson
                              United States Bankruptcy Judge

## CERTIFICATE OF MAILING

I hereby certify that copies of the MEMORANDUM ON CONFIRMATION OF DEBTORS' CHAPTER 11 PLAN were mailed to the following parties in interest:

DATED: MAR - 4 2008

JON D. CERETTO
CLERK OF COURT

By: _____
Deputy Clerk

Office of the United States Trustee
21051 Warner Center Lane, #115
Woodland Hills, CA 91367

Cynthia Futter, Esq.
Anne E. Wells, Esq.
Futter-Wells, P.C.
2463 Ashland Avenue
Santa Monica, CA 90405

Dennis Winters, Esq.
Winters Law Firm
1820 East 17th Street
Santa Ana, CA 92705